IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| TELLY BRIGGS,<br><br>                    Plaintiff,<br><br>vs.<br><br>DANIEL MORALES, in his individual<br>and official capacity, RYAN<br>WISNIESKI, in his individual and<br>official capacity, CHAD OSTMEYER,<br>in his individual and official capacity,<br>and CITY OF IMPERIAL,<br>NEBRASKA, a Political Subdivision<br>of the State of Nebraska,<br><br>                    Defendants. | 7:19-CV-5012<br><br><br>MEMORANDUM AND ORDER |

The plaintiff, Telly Briggs, alleged in his amended complaint civil rights violations pursuant to 42 U.S.C. § 1983 for false arrest, use of excessive force, refusal of access to counsel, interference with a civil child custody matter, and conspiracy to violate his civil rights, as well as a claim that the City failed to train or supervise its law enforcement officers. Filing 7. The plaintiff's claim regarding refusal of access to counsel was previously dismissed by the Court on defendants' motion. Filing 15. At the time of the encounter alleged in the amended complaint, defendants Daniel Morales and Chad Ostmeyer were City of Imperial police officers, and defendant Ryan Wisnieski was the city's Chief of Police. This matter is now before the Court on the defendants' motion for summary judgment. Filing 55. For the reasons that follow, the Court will grant the defendants' motion in part and deny it in part.

# I. STANDARD OF REVIEW

Summary judgment is proper if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). On a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc). Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the evidence are jury functions, not those of a judge. *Id. Barber v. C1 Truck Driver Training, LLC*, 656 F.3d 782, 791-92 (8th Cir. 2011). Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Torgerson*, 643 F.3d at 1042

Typically, in resolving a defendant's summary judgment motion, a court must accept the plaintiff's version of the disputed facts, as well as the reasonable inferences from those facts. *Scott v. Harris*, 550 U.S. 372, 380-81 (2007); *McManemy v. Tierney*, 970 F.3d 1034, 1038 (8th Cir. 2020). However, where a video record blatantly contradicts the plaintiff's account of the event such that no reasonable jury could believe it, the plaintiff's version of the disputed facts may be disregarded in evaluating whether the defendant is entitled to summary judgment. *Id.*

The plaintiff, in resisting a motion for summary judgment pursuant to § 1983, must raise a genuine issue of material fact whether (1) the defendant acted under color of law, and (2) the alleged wrongful conduct deprived the plaintiff of a constitutionally protected federal right. *Samuelson v. City of New Ulm*, 455 F.3d 871, 875 (8th Cir. 2006).

## II. BACKGROUND

The plaintiff and Shaina Musick[1] have a son, born in 2011. Filing 56-16 at 1. The plaintiff alleged that after his relationship with Musick came to an end, a temporary custody order was entered giving physical custody of their son to Musick, and allowing the plaintiff parenting time with his son every other weekend. Filing 7 at 5. The plaintiff and Musick agree that their parenting relationship has been, at best, contentious. Filing 56-16 at 1; filing 65-7 at 4. They often disagreed about the plaintiff's rights regarding information concerning their son's health and well-being. Filing 56-16 at 1-2; filing 65-7 at 4-5. At some point prior to January 6, 2016, Musick began dating defendant Chad Ostmeyer. On September 3, 2016, they exchanged wedding vows. Filing 56-16 at 1.

The plaintiff's and Musick's custody matter was set for trial in late January 2016. Filing 7 at 5. On Saturday, January 2, the plaintiff arrived to pick his son up for his regularly scheduled parenting time. At the exchange, Musick handed the plaintiff a bag of pills without an explanation. Filing 65-7 at 5. Until he was handed the pills, the plaintiff had no idea that his son was suffering from bronchitis. That night, the plaintiff's son was coughing so hard that he vomited while in bed. When the plaintiff returned his son to Musick on Sunday, they argued about the plaintiff's right to be informed about his son's health, medical condition, and physical well-being. The plaintiff called Musick on Monday and argued with her again about not being told about their son's health. *Id.*

---

[1] Shaina Musick is currently married to defendant Chad Ostmeyer, and is now known as Shaina Ostmeyer. Filing 56-16 at 1. Here, for convenience, Mrs. Ostmeyer will be identified only by her maiden name.

On Wednesday, January 6, the plaintiff called Musick several times—Musick estimated about twenty times (filing 56-16 at 2), the plaintiff estimated maybe ten—because he was worried about his son's health. Filing 65-7 at 6. Musick did not answer any of the plaintiff's calls. Filing 65-7 at 7. When he was unable to reach Musick, he called her mother, who told the plaintiff that Musick was at her friend's house. Filing 65-1 at 2. The plaintiff drove to Musick's friend's house, and saw Musick getting into her car when he arrived. Id.; filing 65-7 at 7. According to the plaintiff, he parked, got out of his pickup, and walked toward Musick's car as she started backing out. When Musick did not stop her car after seeing him, the plaintiff shrugged his shoulders and watched as Musick smiled at him, continued to back out, and then drive away. No words were exchanged, and the plaintiff got back into his pickup and drove home. Filing 65-7 at 7-8.

Musick tells a different story. She claims that when she left her friend's house, she first put her son into her car, and then noticed the plaintiff. She rushed to get into her car because she was terrified, locked her car door, backed out, and left for home. Filing 56-16 at 2. Musick claims that the plaintiff followed her for an unspecified distance, and continued to call her. Id. The plaintiff disputes both claims, noting that they were both headed the same direction for less than a half block before Musick turned south and the plaintiff continued straight on Broadway, and that he did not call Musick after she drove off.[2] Filing 65-1 at 2; filing 65-7 at 7-8.

When Musick got home, she called Ostmeyer, crying, and, according to Ostmeyer, told him that the plaintiff showed up uninvited at her friend's house, and that she was scared. Filing 56-14 at 1. Ostmeyer told her to call the

---

[2] For the purposes of the defendants' motion, the Court must credit the plaintiff's account of this encounter, but a jury may not.

4

Chase County Sheriff's Department to report what happened. After speaking with Musick, Ostmeyer went to be with her at her home. Filing 56-14 at 2. Musick called the sheriff's department and spoke with a dispatcher. The dispatcher passed a message on to Deputy Justin Mueller, who returned Musick's call. Filing 56-21 at 4. According to Mueller, Musick told him that the plaintiff had been calling her constantly and driving past her house. *Id.* At some point, Ostmeyer took the phone from Musick and repeated the same story Musick had just reported about the plaintiff, and asked if the sheriff's department could handle the situation.[3] Mueller called Sheriff Kevin Mueller, who is Deputy Mueller's father, and was told that this was a matter for the police to handle. *Id.* Deputy Mueller called Ostmeyer back, told him what Sheriff Mueller had said, and recommended that Ostmeyer send someone else to handle the situation. Filing 56-21 at 5.

Defendant Daniel Morales was hired as a City of Imperial police officer in early November 2015. This was Morales' first job in law enforcement. As of January 6, 2016, Morales had not yet attended the Nebraska Law Enforcement Training Center and obtain certification. Filing 65-10 at 5; filing 56-1 at 1. Morales believes that on the evening of January 6, around 7:30, he was dispatched by the sheriff's department to go speak with Musick. Filing 56-13 at 4. Morales, while he was at Musick's house, didn't remember receiving guidance from Ostmeyer on how to handle matters with the plaintiff, but admitted that it's possible he did receive some guidance from Ostmeyer. Filing 65-10 at 7. According to Morales, Musick told him she was being constantly harassed by the plaintiff, and that she feared for her safety. Filing 56-12 at 7.

---

[3] Mueller recalled speaking with Ostmeyer twice. Filing 56-21 at 4-5. Ostmeyer, however, claimed to not recall speaking with Mueller. Filing 56-14 at 2.

Morales had Musick prepare a handwritten statement, in which she alleged incidents of harassment both prior to January 6, as well as her version of the events that took place earlier that evening. Filing 56-2 at 2-3. Also included in Musick's statement was her acknowledgment that she had previously applied for a protection order, claiming that the plaintiff was harassing her with excessive text messages, but that the court had denied her application. After obtaining Musick's written statement, but apparently without any additional investigation or consultation with the police chief or other authority, Morales went to the plaintiff's residence with the intention of arresting him for disturbing the peace. Filing 56-12 at 8; filing 56-10 at 1; filing 65-10 at 7.

On the evening of January 6, after his brief encounter with Musick, the plaintiff arrived home sometime around 6:30. Filing 65-7 at 8. The plaintiff was in the process of remodeling his house at this time, and recalled doing a couple remodeling tasks and making a couple phone calls when he first got home. An acquaintance, Joe Kirkpatrick, was staying at the plaintiff's house. Id..; filing 56-20 at 2. The plaintiff recalled talking with Kirkpatrick that evening for perhaps an hour regarding a situation involving someone they both knew who had threatened to come to the plaintiff's house with a trained mixed martial arts fighter and "light them up." Id.; filing 7 at 6. Also, when the plaintiff arrived home that evening, he began drinking shots of whiskey, and chasing the shots with beer. Filing 65-7 at 8-9.

Morales arrived at the plaintiff's house around 8:00 p.m. Filing 56-13 at 6. The emergency lights on his cruiser had not been activated. Morales body-worn camera shows that it was dark, and that there were no illuminated exterior lights on the plaintiff's house. Filing 56-3. A window in the plaintiff's front door indicated that lights were on in the house, but a window shade of

6

some kind did not allow Morales to see who or what was inside, or allow the plaintiff to see who was at his front door. Filing 56-3. Morales knocked on the exterior storm door, but did not also identify himself verbally as a police officer. After a momentary delay, the inside front door swung open from Morales' right to left. Straight ahead Morales could see a person, who he later identified as Kirkpatrick, sitting in a chair about ten to fifteen feet inside the house.

Morales said, "How you doin' sir?"—which was probably directed to Kirkpatrick, but almost at the same time, the barrel of a shotgun that the plaintiff was holding appeared from behind the wall to Morales' right. The barrel was pointed downward at approximately a forty-five-degree angle, and directed toward the doorjamb, not at Morales. Filing 56-3. Morales drew his service weapon, aimed it at the plaintiff, and loudly commanded the plaintiff to put his weapon down, three times in rapid succession. *Id.*; filing 56-13 at 7. The plaintiff can be seen on the video placing his shotgun, barrel up, against the wall next to the opened door. Filing 56-3. Morales continued shouting repetitive commands in rapid succession—demanding the plaintiff's name, telling the plaintiff and Kirkpatrick to get out of the house, commanding them to come down from the front porch steps to ground level, and shouting for them to get down on the ground. The video from Morales' body-worn camera shows the plaintiff complying with Morales' commands, but doing so carefully without sudden movements. The plaintiff is also heard to identify himself as Telly Briggs. *Id.*

From the plaintiff's perspective, when Morales knocked on his storm door and failed to identify himself as a police officer, the plaintiff had no idea who was at his door. He asked Kirkpatrick if he was expecting someone, and Kirkpatrick said no. A good friend of the plaintiff had recently been murdered, and the plaintiff was concerned about the threat of being "lit up" by a trained

fighter. Filing 65-7 at 10-11. Consequently, the plaintiff grabbed his shotgun before opening the door for whoever it was that was knocking. When he saw Morales' badge and recognized that he was a law enforcement officer, he immediately placed his shotgun against the wall and began complying with Morales' commands. Filing 65-7 at 13.[4] When the plaintiff and Kirkpatrick were outside, Morales shouted conflicting commands. He shouted several times for them to get down on the ground, but mixed in were shouts to "take a seat." In between Morales' commands, the plaintiff asked several times, "what do you want?" but didn't get an answer.

The plaintiff attempted to sit down, but Morales grabbed him and took him all the way to the ground, placed a knee on the plaintiff's back, and secured him in handcuffs. Filing 65-7 at 14-15. In the process of securing the plaintiff, Morales shouted, "What are you doing man? Why would you answer your door with a shotgun? What's going on? What's going on?" Responding to the question about answering his door with a shotgun while Morales was still shouting his questions, the plaintiff is heard to say, "Because I don't know who the f**k is there."

Now handcuffed and lying face down in snow, the plaintiff asked Morales again, "What the f**k do you want from me?" Filing 56-3. Morales responded, "What have you been doing tonight? Have you been bothering somebody?" The plaintiff, obviously confused, replied that he's been here at home, and Kirkpatrick affirmed, saying "Yes, he's been here." Morales then said, "What happened today? What happened with Shaina?" The plaintiff's reaction was, "Are you f**ckin' sh*ttin' me," which he repeated several times before calling

---

[4] At this point, Morales' body-worn camera is, for the most part, directed away from any light source, so very little can be seen on the video except darkness and flashes of light. However, Morales' body-worn microphone continued to record the audio of the encounter.

Morales a motherf**ker. Morales now informs the plaintiff that he is being arrested for disturbing Musick's peace. Not surprisingly, the plaintiff did not take this news well, and responded with a barrage of profanity and a demand to be taken to jail now.

Morales moved the plaintiff to his feet and started taking him to his cruiser for transport to jail. At some point, Deputy Justin Mueller showed up to assist Morales, and Morales' body-worn microphone stopped functioning. Once at Morales' cruiser, the plaintiff's upper body was placed on the hood of Morales' cruiser. The plaintiff, either out of frustration or purposefully, banged his chin on the hood of Morales' cruiser causing some damage to the hood. Filing 56-12 at 12; filing 65-7 at 16. The plaintiff was eventually placed in Mueller's cruiser and taken to the Chase County jail. Filing 56-12 at 13.

Once there, the plaintiff refused to cooperate with the booking process, cursed constantly, and demanded to make a phone call to his lawyer (which was denied). Filing 56-12 at 13-14; filing 56-6. The plaintiff was then placed in an isolation cell, where he promptly turned the water on in the sink. The sink drain couldn't keep up with the inflow from the faucet, and so the sink overflowed and flooded the cell. The plaintiff also broke off the toilet seat and used it to pound on the cell walls until the seat itself broke. Filing 56-6. When the plaintiff refused to change into a jail uniform, Mueller and Morales physically forced him to do so, with Mueller discharging his taser during the confrontation. Filing 56-7.

The plaintiff was charged with felony terroristic threats and the use of a deadly weapon in connection with his confrontation with Morales at his house, felony assault on an officer, misdemeanor obstruction of a peace officer, and two misdemeanor counts of criminal mischief in connection with his conduct in the jail and the property damage associated with his arrest, and misdemeanor

disturbing the peace regarding Musick's claim. Filing 56-22 at 6-8. A preliminary hearing was held on April 13, 2016. Filing 56-23 at 1. The county court found that there was sufficient evidence to support the three felony charges, bound those charges over to the district court for trial, and waived jurisdiction on the misdemeanor charges. Filing 56-23 at 43-44. In a trial to the District Court, the plaintiff was found guilty of the charges connected to his conduct at the jail, and damage to the hood of Morales' cruiser, but acquitted of the terroristic threats and use of a deadly weapon charges, as well as the claim that precipitated this whole event, disturbing Shaina Musick's peace. Filing 65-11.

## III. DISCUSSION

Qualified immunity shields public officials performing discretionary functions from liability for conduct that does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Parker v. Chard*, 777 F.3d 977, 979 (8th Cir. 2015); *see Messerschmidt v. Millender*, 132 S. Ct. 1235, 1244 (2012); *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). In determining whether a government official is entitled to qualified immunity, the Court asks (1) whether the facts alleged establish a violation of a constitutional or statutory right and (2) whether that right was clearly established at the time of the alleged violation, such that a reasonable official would have known that his actions were unlawful. *Johnson v. Phillips*, 664 F.3d 232, 236 (8th Cir. 2011); *see Parker*, 777 F.3d at 980.

For a right to be clearly established, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. *White v. Pauly*, 137 S.Ct. 548, 551 (2017); *Parker*, 777 F.3d at 980. Clearly established law is not defined at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably

in the particular circumstances that he or she faced. *White,* 138 S.Ct. at 552; *Parker*, 777 F.3d at 980; s*ee Seymour v. City of Des Moines*, 519 F.3d 790, 798 (8th Cir. 2008). It is unnecessary to have a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate. *White*, 138 S.Ct. at 551; *Parker*, 777 F.3d at 980.

## 1. Unlawful Arrest Claim

The defendants argue that warrantless arrests are lawful if supported by probable cause, and here, probable cause for the plaintiff's arrest was litigated in the plaintiff's criminal prosecution and found to exist. But in any event, the argument continues, the individual defendants here would not have known that their actions violated the plaintiff's clearly established Fourth Amendment constitutional rights. Filing 56 at 22-30. Both parties focus much of their arguments on the existence of probable cause and whether the plaintiff's arrest without a warrant is authorized pursuant to Neb. Rev. Stat. § 29-404.02. The parties' sole focus on probable cause, however, misses the point. Probable cause for an arrest, whether for a misdemeanor or felony, is only one factor to consider when an arrest occurs in a plaintiff's home.

Probable cause alone is insufficient to justify an arrest in a home. It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable. *Payton v. New York*, 445 U.S. 573, 586 (1980). The Fourth Amendment requires that absent exigent circumstances, the threshold of a home may not be crossed without a warrant. *Payton*, 445 U.S. at 590; *Duncan v. Storie*, 869 F.2d 1100, 1102 (8th Cir. 1989); *State v. Schlothauer*, 294 N.W.2d 382, 384 (Neb. 1980). The Nebraska Supreme Court has held that the Court's decision in *Payton* must be implicitly

incorporated into § 29-404.02. *State v. Tipton*, 294 N.W.2d 869, 871 (Neb. 1980).

Consistent with *Payton*, *Schlothauer,* and *Tipton*, here, it was necessary for the defendants to address with evidence, and argue in their briefing (1) whether the plaintiff's arrest was in his home or in a public place, and, if it was in his home, (2) whether there were exigent circumstances justifying the plaintiff's in-home warrantless arrest. The defendants have not done so, at this point.

A warrantless arrest of an individual in a public place upon probable cause does not violate the Fourth Amendment, and a dwelling's doorway is not an area where one would have an expectation of privacy. *United States v. Santana*, 427 U.S. 38, 42 (1976). Thus, the doorway of a home may be a public place for the purpose of making a warrantless arrest when the individual has voluntarily come to stand in the doorway. *Id.*; *Mitchell v. Shearrer,* 729 F.3d 1070, 1075 (8th Cir. 2013); *Duncan*, 869 F.2d at 1102. But where an individual is compelled to stand in a doorway, a warrantless arrest cannot be lawful in the absence of probable cause and exigent circumstances. *Id.*; *United States v. Connor*, 127 F.3d 663, 666 (8th Cir. 1997).

Summary judgment is proper if the movant, which here is the defendants, shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). The movant has the initial obligation to inform the court of the basis for its motion and must identify the portions of the record that it believes demonstrates the absence of a genuine dispute of material fact. *Torgerson*, 643 F.3d at 1042. This initial burden is not stringent and is regularly discharged with ease. *St. Jude Med., Inc. v. Lifecare Int'l, Inc.*, 250 F.3d 587, 596 (8th Cir. 2001). But still, it is a burden that the movant must undertake.

12

The moving party may fulfill its burden by either producing evidence negating an essential element of the nonmoving party's case, or show that the nonmoving party does not have enough evidence of an essential element of its claim to carry its ultimate burden at trial. *Nissan Fire & Marine Ins. Co. v. Fritz Cos.,* 210 F.3d 1099, 1106 (9th Cir. 2000). Stated differently, if the nonmovant must prove *X* to prevail at trial, the movant can either produce evidence that *X* is not so, or point out that the nonmovant lacks the evidence to prove *X. Bedford v. Doe,* 880 F.3d 993, 996-97 (8th Cir. 2018).

Here, there is no indication in the defendants' evidence that Morales or Ostmeyer first considered whether a warrant should be obtained before Morales went to the plaintiff's home to arrest him for disturbing Musick's peace. In fact, Morales testified that he believed a warrant was not necessary. Filing 56-23 at 19-20. The defendants argue that there was probable cause that earlier that evening the plaintiff had disturbed Musick's peace, but they do not address the determinative issues of (1) whether the plaintiff was arrested in his home or in a public place, and if he was arrested in his home, (2) what exigent circumstances were present justifying the plaintiff's warrantless in-home arrest. Further, the defendants have not pointed out how the plaintiff lacks the evidence to prove that his arrest was unlawful—meaning, that he was arrested in his home, and that no exigent circumstances justified his in-home arrest—even if the Court were to agree that there was probable cause (or arguable probable cause) for the plaintiff's arrest.

Because the parties did not address the determinative constitutional issues with respect to an in-home arrest, they also did not address the clearly established prong of a qualified immunity analysis. The Court, however, finds that it was clearly established in January 2016 that a warrantless arrest absent exigent circumstances in a person's home was presumptively

unreasonable. *Payton*, 445 U.S. at 586. Further, in January 2016, it was clearly established that an unconstitutional intrusion occurs when a person is compelled to leave a zone of privacy in response to a law enforcement officer's demand under color of authority. *Connor*, 127 F.3d at 666; *Duncan*, 869 F.2d at 1102-03.

For these reasons, the Court finds that the defendant's motion for judgment as a matter of law on the plaintiff's unlawful arrest claim must be denied at this stage of the proceedings.

## 2. Unreasonable or Excessive Force Claim

The right to be free from excessive force in the context of an arrest is clearly established under the Fourth Amendment. *Small v. McCrystal*, 708 F.3d 997, 1005 (8th Cir. 2013). Not every push or shove violates the Fourth Amendment. *Graham v. Connor*, 490 U.S. 386, 396 (1989). The test as to whether force is excessive examines whether the officer's actions were objectively reasonable in light of the facts and circumstances the officer was facing. *Id.*; *Rohrbough v. Hall*, 586 F.3d 582, 586 (8th Cir. 2009). Objective reasonableness is judged from the perspective of a reasonable officer on the scene, and not with the 20/20 vision of hindsight. *Chambers v. Pennycook*, 641 F.3d 898, 906 (8th Cir. 2011).

Objective reasonableness depends on the facts and circumstances of the specific case. *Rohrbough*, 586 F.3d at 586. Circumstances relevant to the inquiry include: (1) the severity of the crime at issue, (2) whether the individual poses an immediate threat to the safety of the officers or others, and (3) whether the individual is actively resisting arrest or attempting to evade arrest by flight. *Graham*, 490 U.S. at 396; *Samuelson v. City of New Ulm*, 455 F.3d 871, 876 (8th Cir. 2006). "Force is least justified against nonviolent

14

misdemeanants who do not flee or actively resist arrest and pose little or no threat to the security of the officers or the public." *Small*, 708 F.3d at 1005.

The defendants argue that no jury could conclude that the force used to effect the plaintiff's arrest was objectively unreasonable. Filing 56 at 32. After viewing the evidence in the plaintiff's favor, the Court agrees. The plaintiff only described two incidents which caused the plaintiff physical pain or injury. One was that when Morales took the plaintiff to the ground and placed him in handcuffs, he restrained the plaintiff by placing a knee on the plaintiff's back. The plaintiff had a prior back surgery, and claimed that he felt a tingling going through his legs, but said nothing about it to Morales. Filing 65-7 at 15-16. The second was when Morales walked the plaintiff to his cruiser. The plaintiff claimed that Morales jerked down on the handcuffs, which pulled a bunch of skin off the plaintiff's wrists. Filing 65-7 at 16. No evidence was produced showing that the plaintiff sought, or required, medical care for back pain or injury to his wrists. The plaintiff's allegation that he "sustained medical bills in the expected amount of $80,000.00" is completely without evidentiary support. Filing 7 at 13.

The plaintiff's argument that Morales' use of force was excessive relies on the assertion that at no time did the plaintiff pose a danger to Morales. Filing 65 at 33. The Court disagrees. Police officers are often in situations where they are required to make split-second judgments about the force necessary in a particular situation in circumstances that are tense, uncertain, and rapidly evolving. *Graham*, 490 U.S. at 397. Here, it is objectively reasonable for an officer to react as Morales did by drawing his service weapon and ordering the plaintiff and Kirkpatrick out of the house after seeing the plaintiff peeking around from behind a wall with a shotgun in hand.

15

It was also objectively reasonable for Morales to order, or take, the plaintiff to the ground and place him in handcuffs to secure his safety and the safety of others. It would be objectively reasonable for a law enforcement officer in Morales' situation to assume that the plaintiff may have had a handgun, or another weapon such as a knife, hidden on his person, even though in hindsight he didn't. Thus, although in hindsight the plaintiff did not pose an actual threat to Morales, his conduct is assessed in light of the facts and circumstances that Morales faced in the actual encounter, and judged from the perspective of a reasonable officer. *Chambers*, 641 F.3d at 906; *Rohrbough*, 586 F.3d at 586.

In *Partlow v. Stadler*, the plaintiff was in his apartment, and was reported by his aunt to be suicidal. 774 F.3d 497, 500 (8th Cir. 2014). A police officer on the scene called for backup, and after the other officers arrived, they heard a sound and saw the plaintiff leaving his apartment with a shotgun in one hand and his aunt holding onto his other arm. *Id.* One officer shouted "Gun! He's got a gun." The other officers yelled "Drop the gun," or "Put the gun down." According to the plaintiff, he was turning to put the shotgun down when the officers opened fire. *Id.* The Court of Appeals held that even if the plaintiff intended to do no harm to the officers, the officer's use of force was objectively reasonable given that they had no way of knowing what the plaintiff planned to do. *Id.* at 502. "[A] reasonable officer would have had probable cause to believe that Partlow posed a threat of serious physical harm, and any mistake in believing that he posed such a threat was objectively reasonable." *Id.* at 503. If the force used upon seeing an individual with a shotgun in hand was objectively reasonable in *Partlow*, then so too was the force Morales used to secure the plaintiff.

16

Here, although it is true that the severity of the crime that brought Morales to the plaintiff's home was low (assuming, that is, Musick's peace was actually disturbed). It is also true that when the evidence regarding his encounter with Morales is viewed from the plaintiff's perspective, he was neither resisting arrest nor attempting to flee, notwithstanding his steady stream of profanity directed at Morales and later at Deputy Mueller. Nonetheless, it was objectively reasonable for Morales to assume that the plaintiff posed a substantial danger to himself and others when he appeared at his door with a shotgun in hand, and where Morales was unable to know whether the shotgun was the only weapon within the plaintiff's reach. Morales is entitled to qualified immunity regarding the plaintiff's Fourth Amendment excessive force claim.

### 3. OFFICIAL CAPACITY FAILURE TO TRAIN CLAIM

In *City of Canton, Ohio v Harris,*, the Supreme Court concluded that there are limited circumstances in which a failure to train allegation can be the basis for liability under § 1983. 489 U.S. 378, 387 (1989). "[T]he inadequacy of police training may serve as the basis for liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Id.* at 388. The focus in determining whether a city has liability concerns the adequacy of a training program in relation to the tasks the particular officers must perform, and for liability to attach, the specific training program deficiency must be closely related to the ultimate injury. *Id.* To establish a failure to train claim, a plaintiff must show that (1) the municipality's training practices were inadequate, (2) the municipality was deliberately indifferent to the plaintiff's rights when adopting the training practices such that the failure to train reflected a deliberate or conscious

17

choice, and (3) the plaintiff's injury was actually caused by the alleged deficiency in the training practices. *Graham v. Barnette*, 5 F.4th 872, 891 (8th Cir. 2021).

The plaintiff alleged that Morales had no, or minimal training, and was merely an uncertified recruit, who was allowed to carry out the full duties of a law enforcement officer. Filing 7 at 14. Morales acknowledged that he had not attained certification from the Nebraska Law Enforcement Training Center at the time of his encounter with the plaintiff. Filing 65-10 at 5. The defendants, however, have elected to not rely on evidence regarding Morales' training, or his competency to carry out the duties of a law enforcement officer. Instead, the defendants assert that they are due judgment as a matter of law on the plaintiff's failure to train claim because there is no underlying constitutional violation. As detailed above, the Court does not agree with the defendants' assertion that as a matter of law there is no underlying constitutional violation regarding the plaintiff's arrest.

Again, the defendants, as the movant, had the initial obligation to inform the Court of the basis for its motion and was required to identify the portions of the record that they believe demonstrates the absence of a genuine dispute of material fact. *Torgerson*, 643 F.3d at 1042. The defendants' initial burden is not stringent and is regularly discharged with ease. *St. Jude Med., Inc. v. Lifecare Int'l, Inc.*, 250 F.3d 587, 596 (8th Cir. 2001). But here, in their brief, the defendants relied solely on dismissal of the plaintiff's underlying constitutional claims as the basis for dismissal of the plaintiff's failure to train claim. Filing 56 at 42-43.

The fact that the defendants' did not identify portions of the evidentiary record that they believe demonstrates an absence of a genuine issue of material fact regarding the adequacy of the training Morales received, requires the

Court to find that the defendants' motion for judgment as a matter of law on the plaintiff's failure to train claim must be denied at this stage.[5]

## 4. SUBSTANTIVE DUE PROCESS CLAIM

The plaintiff alleged that his arrest for disturbing the peace was directed by Ostmeyer and Wisnieski with knowledge of the plaintiff's pending custody hearing. The plaintiff also alleged that the defendants interfered with his custodial rights by intimidation. Filing 7 at 17. The plaintiff testified that after the January 6 encounter, Ostmeyer or Wisnieski were often present when custody of his son was exchanged. Filing 65-1 at 3-4. The plaintiff claims that the officers would exhibit a menacing demeanor, and have their hand on their service weapon, tapping it with a finger. Filing 65 at 14. Ostmeyer characterized his presence at the custody exchanges as "civil stand-bys." Filing 65-12 at 3. The evidence does not show that these civil stand-bys were pursuant to a court order.

The plaintiff, and Wisnieski, both described a custody exchange where either Musick or Ostmeyer asked Wisnieski to have the plaintiff submit to an alcohol breath test. Filing 65 at 15; filing 65-9 at 3. The plaintiff also described another occasion where he attended his son's school program, and Ostmeyer stood over the plaintiff in a threatening manner as the plaintiff congratulated his son. Filing 65 at 15; filing 65-1 at 4-5. The plaintiff's evidence included

---

[5] The Court observes that Wisnieski averred that as of January 6, 2016, Morales had completed training with the department, which included ride-along experience. Filing 56-15 at 3. The specifics of Morales' training with the department were not addressed. The defendants do not assert or argue that Wisnieski's statement met their initial burden for judgment as a matter of law.

phone video clips of two daylight custody exchanges where an officer is shown standing close by, near a police cruiser, exhibiting a menacing demeanor. Filing 65-3; filing 65-4. Also included is a video clip from Ostmeyer's body-worn camera of a verbal confrontation between the plaintiff and Ostmeyer on the occasion when the plaintiff attended his son's school program. Filing 65-5.

The Due Process Clause of the Fourteenth Amendment provides that a State shall not "deprive any person of life, liberty, or property, without due process of law." The substantive component of the Due Process Clause "protects individual liberty against certain government actions regardless of the fairness of the procedures used to implement them." *Collins v. City of Harker Heights,* 503 U.S. 115, 125 (1992); *Schmidt v. Des Moines Public Schools,* 655 F.3d 811, 816 (8th Cir. 2011). Parents have a fundamental liberty interest in the care, custody, and management of their children, but that right is not absolute. *Zakrzewski v. Fox,* 87 F.3d 1011, 1014 (8th Cir. 1996). To prove a substantive due process violation of a parent's liberty interest by state officials, the parent must demonstrate that the state officials abused their official power in a manner that shocks the conscience, regardless of the availability of state law remedies *Id.* Recovery for a substantive due process claim is properly reserved for truly egregious actions and extraordinary cases. *Id.*

The defendants argue that the plaintiff has made only bare legal assertions that there was interference with his parental rights, which is insufficient to make out a substantive due process claim. The Court essentially agrees. First, no one disputes that the plaintiff, as a non-custodial parent, has a parental role that deserves to be protected as a liberty interest. If a state court awards visitation rights to a non-custodial parent, that parent is then taking part in raising their child by making decisions about care, custody, and management during the period of visitation, and thus has a parental role that

deserves to be protected as a liberty interest. *Swipes v. Kofka*, 419 F.3d 709, 714 (8th Cir. 2005).

The problem here is that the plaintiff's evidence fails to show that his liberty interest in the care, custody, or management of his son has been unreasonably interrupted in any way. The plaintiff described what is arguably problematic conduct by city law enforcement officers, but conduct that did not deny the plaintiff access to his son, or impair in any way the plaintiff's ability to care for, or manage his relationship with his son.

In *Zakrzewski*, law enforcement intervened to return the plaintiff's son to his ex-wife following a dispute over whether the plaintiff could extend his monthly six-day visitation. 87 F.3d at 1012-13. The plaintiff argued that the officers unreasonably interfered with his liberty interest in parenting his son because his visitation was unreasonably interrupted. *Id.* at 1013. The Court of Appeals concluded that the facts were insufficient to show that the officers had intentionally infringed upon the plaintiff's liberty interest in a manner that shocked the conscience. The plaintiff was not deprived of his parental right of visitation, but instead, his visitation was cut short on one occasion when the officers were confronted with a complaint that he had violated the terms of a degree. *Id.* at 1014.

The Court finds that here, the plaintiff was not deprived of his liberty interest in parenting his son, even if the Court were to accept the motives that the plaintiff ascribes to Ostmeyer and Wisnieski. The officers' actions may be cause for concern, but they are not the kind of truly egregious actions, and this is not the kind of extraordinary case, that substantive due process was intended to address.

5. Conspiracy Claims

The plaintiff alleged that the individual defendants conspired to violate his Fourth Amendment rights in connection with his unlawful arrest and the excessive use of force, and conspired to violate his substantive due process rights regarding interference with his parental visitation rights. Filing 7 at 11-17. The defendants posit two arguments. First, the defendants argue that the plaintiff's conspiracy claims fail because there is no underlying constitutional violation. Filing 56 at 42. The Court agrees with respect to the plaintiff's unreasonable or excessive use of force claim, as well as with the plaintiff's substantive due process claim. But the Court has determined that Morales is not entitled to judgment as a matter of law on the plaintiff's unlawful arrest claim, and as such, all defendants are not entitled to judgment on the plaintiff's unlawful arrest conspiracy claim for the reason that there is no underlying constitutional violation.

Second, the defendants argue that there is no evidence of any agreement to deprive the plaintiff of a constitutional right. Filing 56 at 42. According to the defendants, Ostmeyer was not involved in any manner in the pre-arrest conversations between Morales and Musick, or involved in the arrest itself. The plaintiff disagrees, and argues that there is "overwhelming" circumstantial evidence supporting an unlawful arrest conspiracy involving Ostmeyer, Musick and Morales.

To show a constitutional conspiracy, a plaintiff must show that two or more individuals conspired for the purpose of depriving, either directly or indirectly, the plaintiff of a constitutional right, and that an act was done in furtherance of the conspiracy that caused an injury or deprivation. *Marti v. City of Maplewood, Mo.*, 57 F.3d 680, 684 (8th Cir. 1995). The elements of a conspiracy are rarely established through means other than circumstantial

evidence. *Westborough Mall, Inc. v. City of Cape Girardeau, Mo.,* 693 F.2d 733, 743 (8th Cir. 1982). Summary judgment is warranted when the evidence is so one-sided as to leave no room for any reasonable difference of opinion as to how the case should be decided. *Id.*

Here, although thin (and certainly not overwhelming), there is circumstantial evidence of a conspiracy involving Ostmeyer, Musick, and Morales, the object of which was to arrest the plaintiff in his home without a warrant on a misdemeanor charge of disturbing the peace. The evidence shows that Musick called Ostmeyer when she got home to tell him about the plaintiff approaching her as she left her friend's home. Filing 56-14 at 1. Ostmeyer told Musick to call the Chase County Sheriff's Department and ask for a deputy to report what had occurred. *Id.* Ostmeyer then went to Musick's home. Although he claimed to not recall speaking with Deputy Mueller, Mueller specifically remembered speaking with Ostmeyer who was at Musick's home when he returned Musick's call. According to Mueller, Ostmeyer repeated what Musick had told him about the plaintiff, and asked if the Sheriff "could handle it." Filing 65-8 at 3. Mueller, after speaking with the sheriff, called Ostmeyer back and told him that the police would have to "send somebody else over there." Filing 65-8 at 4.

Morales said he believed he was dispatched to Musick's house by the sheriff's department. Filing 56-13 at 4. But that is inconsistent with Mueller's statement to Ostmeyer that the police would have to send somebody else over to handle the plaintiff. Morales knew Ostmeyer was at Musick's home when he took her statement, but said that he didn't recall whether Ostmeyer gave him any guidance as to how he should handle the situation with the plaintiff. Morales did, however, admit that it was possible that Ostmeyer gave him some guidance. Filing 65-10 at 7. On January 6, 2016, Ostmeyer and Morales were

23

both police officers,[6] but Ostmeyer was the senior officer and Morales was newly hired and relatively inexperienced.

The question whether there was a conspiracy to deprive a plaintiff of a constitutional right should not be taken from a jury if there is a possibility the jury could infer from the circumstances an understanding among the conspirators to achieve the conspiracy's objective. *White v. McKinley*, 519 F.3d 806, 816 (8th Cir. 1996). For summary judgment to be warranted, a court must be convinced that the evidence presented is insufficient to support *any reasonable inference* of a conspiracy. *Id.* Here, the evidence of Ostmeyer's involvement, his faulty memory of speaking with Deputy Mueller, Morales' inconsistent recollection about what law enforcement department dispatched him to Musick's home, Ostmeyer's presence when Morales was in Musick's home, Morales' admission that it was possible that Ostmeyer could have given him some guidance about how to handle the situation with the plaintiff, the fact that Ostmeyer was the senior officer and Morales was newly hired and relatively inexperienced, and the fact that Morales did not seek approval for the plaintiff's in-home arrest from Chief Wisnieski or the county attorney, gives rise to a reasonable inference that Ostmeyer, Musick, and Morales may have reached an agreement or understanding to unlawfully arrest the plaintiff in his home without a warrant. A jury must ultimately decide whether, when, and between whom a conspiracy actually occurred.

## IV. CONCLUSION

The defendants' motion for summary judgment regarding the plaintiff's excessive force, and substantive due process claims, as well as all claims against Ryan Wisnieski in his individual capacity is granted. The defendants'

---

[6] Ostmeyer was promoted to sergeant in the fall of 2016. Filing 65-17 at 2.

motion for summary judgment regarding the plaintiff's unlawful arrest claim against Morales, and unlawful arrest conspiracy claim against Morales and Ostmeyer, as well as the plaintiff's failure to train claim is denied at this stage of the proceedings.

IT IS ORDERED:

1.     Defendants' motion for summary judgment (filing 55) is granted in part and denied in part as set forth above.

2.     This case is referred to the Magistrate Judge for case progression.

Dated this 24th day of November, 2021.

BY THE COURT:

John M. Gerrard
United States District Judge

25